IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMARA BREWER, | ) | Case No. 1:17-cv-250 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Tamara L. Brewer ("Brewer"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ's evaluation of the opinions of the treating physician complied with applicable regulations and because substantial evidence supported the ALJ's conclusion that Brewer's rheumatoid arthritis condition did not meet the requirements of Listing 14.09, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Brewer applied for SSI and DIB on September 24, 2013 (Tr.165) alleging a disability onset date of May 19, 2012.  (Tr.80)  Brewer alleged disability based on diabetes mellitus, hypothyroid disease, rheumatoid arthritis, depression, and frozen shoulder.  (Tr. 80, 181) Brewer's application was denied initially and on reconsideration.  (Tr. 125)  Thereafter, Brewer filed a written request for rehearing.  (Tr. 132)  Administrative Law Judge Frederick Andreas ("ALJ") heard the case on November 19, 2015.  (Tr. 35-79)  The ALJ denied Brewer's claim on January 27, 2016.  (Tr. 14)  The Appeals Council denied further review on December 6, 2016, rendering the ALJ's January 27, 2016, decision the final decision of the Commissioner.  (Tr. 1-3)

## III.     Evidence

Brewer now raises two arguments: (1) the ALJ erred in weighing the opinions of treating rheumatologist, Jeffrey A. Chaitoff, M.D. and (2) the ALJ erred when he found that Brewer's rheumatoid arthritis did not meet the criteria of Listing 14.09, which concerns arthritis and inflammation of certain joints. 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  Because the issues are limited, it is not necessary to summarize the entire record.

### A.     Personal, Educational and Vocational Evidence

Brewer was 38 years old on her alleged onset date, and had turned 41 by the time of the hearing.  (Tr. 72, 117)  Brewer completed the eleventh grade but never attained a GED.  (Tr. 309)  Brewer has worked as a cashier, customer service manager, and a telemarketer.  (Tr. 183)

## B.     Medical Records Related to Rheumatoid Arthritis

Medical records addressing Brewer's arthritis date back to September 20, 2012 when she complained of left knee pain while hospitalized at Hillcrest Hospital because of diabetes complications.  (Tr. 255)  X-rays of Brewer's knee showed Brewer's bones were intact, no joint effusion, and a moderately narrowed medial joint, without any eburnation or spurring.  (Id.)

On September 13, 2012, Brewer went to the Emergency Department at University Hospitals Geauga Medical Center with non-traumatic pain and spasms on the left side of her neck.  (Tr. 278, 305)  She reported that her neck pain had been continuous since the day before and described it as sharp and severe, and exacerbated by movement.  (Id.)  Brewer rated the pain as a nine or ten on a ten scale.  (Id.)  Other than tenderness over the spastic trapezius and strap muscles on Brewer's left side, her physical examination was unremarkable.  The examiner characterized Brewer's pain as "moderate."  (Tr. 305)  The physician ordered cervical-spine films and prescribed Norflex and Toradol IM.  (Tr. 305)  X-rays of Brewer's cervical spine from September 13, 2012 showed reversal of normal cervical lordosis and minimal spurring off of C5 and C6.  (Tr. 300)

On October 8, 2012, Beejadi Mukunda, M.D. treated Brewer for anemia and diabetes. (Tr. 472)  Dr. Mukunda found no muscular tenderness or weakness or joint swelling and noted that Brewer displayed a normal range of motion.  (Tr. 473)

On November 8, 2012 Rheumatologist Jeffrey A. Chaitoff, M.D. treated Brewer for her complaint of pain "all over the body" that had continued for two months.  (Tr. 461)  Dr. Chaitoff noted that he suspected rheumatoid arthritis and he planned to check Brewer's blood for antinuclear antibodies, CGP antibodies, and rheumatoid factor.  (Id.)  Dr. Chaitoff also prescribed the steroid Prednisone and Roxicodone for pain.  ((Id.))

Dr. Chaitoff saw Brewer again on December 19, 2012 for left shoulder pain. (Tr. 392) Dr. Chaitoff's examination revealed no tendinosis, tendinous rupture, tears, or fluid accumulation. (Id.) Dr. Chaitoff did observe that the subacromial bursa had a slight distention and the bursa stripe was thickened. ((Id.))

Dr. Chaitoff saw Brewer on January 2, 2013, for her complaint of rheumatoid arthritis. (Tr. 393) Dr. Chaitoff observed that Brewer's extremities had no rheumatoid nodules or tophaceous deposits. (Id.) He prescribed methotrexate tablets and Humira. (Id.)

On February 20, 2013, Dr. Chaitoff saw Brewer regarding a complaint of "daily" right shoulder pain. (Tr. 394) Dr. Chaitoff noted that the joint tenderness and joint swelling counts were both four. (Id.) Brewer reported the joint was stiff in the morning for a duration of sixty minutes. (Id.) Dr. Chaitoff observed Brewer's right shoulder had a "decent" range of motion, but the pectoral muscles were tender. (Id.) He also observed mild synovitis at Brewer's metacarpophalangeal joints. (Id.) Dr. Chaitoff diagnosed: rheumatoid arthritis; an adverse reaction to methotrexate, including minimal hair loss; and right shoulder pain, which he suspected was due to a muscle spasm. (Id.) Dr. Chaitoff reduced Brewer's prescription of methotrexate and also prescribed folic acid and Humira (adalimumab). (Id.)

On March 14, 2013, Dr. Chaitoff saw Brewer regarding her complaints of [bi]lateral shoulder pain and her request for a cortisone shot for her more painful left shoulder. (Tr. 395) Dr. Chaitoff observed diminished range of motion in both of Brewer's upper extremities. (Id.) Dr. Chaitoff diagnosed adhesive capsulitis of both shoulders, left shoulder pain, and rheumatoid arthritis. (Id.) Dr. Chaitoff injected the left shoulder with methylprednisolone and lidocaine, planned a diagnostic ultrasound, and continued treatment with methotrexate. (Id.)

On May 31, 2013, Dr. Chaitoff saw Brewer regarding her complaint of rheumatoid arthritis. (Tr. 396) Brewer reported that she "felt excellent" after taking Humira weekly, but her generalized pains recurred when she began taking the drug only once every two weeks. (Id.) Brewer reported pain in her knees, shoulders, hands, feet, and left temporomandibular joint. (Id.) Dr. Chaitoff discontinued the methotrexate and Humira, and prescribed Simponi injections, Azathioprine, Prednisone, and Roxicodone, "if needed for severe pain." (Id.)

On June 21, 2013, Dr. Chaitoff saw Brewer regarding her rheumatoid arthritis. (Tr. 397) Brewer reported that a single subcutaneous injection of Simponi made her feel significantly improved within three days. (Id.) Dr. Chaitoff prescribed daily Azathioprine and monthly Simponi injections. (Id.)

On October 4, 2013, Dr. Chaitoff saw Brewer regarding a flare-up of her rheumatoid arthritis. (Tr. 398) Brewer reported that she tends to do well for three weeks, but her condition flares-up on the third week. (Id.) Brewer complained of being up all night with joint pains. (Id.) Dr. Chaitoff prescribed continued treatment with Simponi, Prednisone, and Roxicodone, if needed for severe pain. (Id.)

On November 14, 2013, Dr. Chaitoff saw Brewer regarding her complaints of pain in her left elbow and right wrist. (Tr. 399) Brewer reported that she only had nine "normal days" following an injection of Simponi. (Id.) Dr. Chaitoff stated that Brewer's rheumatoid arthritis was "stable and under control" and noted that her Vectra "score was actually low." He identified left lateral epicondylitis as an independent problem, and observed that "fibromyalgia syndrome" counted for much of Brewer's symptoms. (Id.) Dr. Chaitoff injected Brewer's right wrist with methylprednisolone and lidocaine, performed "dry needling" of the left lateral epicondyle, and prescribed Cymbalta, Simponi, Azathioprine, and Prednisone. (Id.)

On December 16, 2013, Dr. Chaitoff saw Brewer regarding her complaints of arthritis in her joints, and her left elbow in particular. (Tr. 400) Brewer rated the intensity of her pain as severe and the joint tenderness count was two, while the joint swelling count was three. (Id.) Brewer reported that she experienced morning stiffness that lasted for ten minutes. (Id.) Dr. Chaitoff observed that Brewer's left lateral epicondyles were tender on palpation. (Id.) Dr. Chaitoff determined Brewer's left elbow pain was extra-articular at the tennis elbow site, the Vectra test score implied Brewer's rheumatoid arthritis was under control, and her "fibromyalgia syndrome" accounted for much of Brewer's symptoms. (Id.) Dr. Chaitoff prescribed Voltaren gel and continued treatment with Cymbalta, Simponi, and Azathioprine. (Id.)

Dr. Chaitoff also evaluated Brewer on February 10, 2014 regarding her complaints of pain in her right wrist and stiffness in the morning. (Tr. 401) Brewer reported that the Cymbalta had "helped a lot" and that she used oxycodone sparingly. (Id.) Dr. Chaitoff observed that Brewer's right wrist had mild swelling and tenderness, but her shoulders, knees, and ankles had no deformity, synovitis, or effusion. (Id.) He observed no rheumatoid nodules or tophi. (Id.) Dr. Chaitoff prescribed Azathioprine, Simponi, Cymbalta, and Roxicodone. (Id.)

On March 5, 2014, Brewer went to the University Hospitals Emergency Department with complaints of dizziness and nausea. (Tr. 376) An examiner observed that Brewer's extremities, back and spine were within normal limits. (Tr. 361) Brewer was diagnosed with acute sinusitis and vertigo; she was prescribed antibiotics, Antivert, and Claritin, and discharged to home. (Tr. 376-77)

In 2014, 2015, and 2016, Dr. Chaitoff evaluated and treated Brewer on several occasions for her rheumatoid arthritis, pain in her right first metatarsal phalangeal joint, swelling in her feet, rashes, and "morning stiffness." (Tr. 543-555, 558-567, 653) Sometimes, Brewer reported

that she felt well or was pleased with the results of her medications. (Tr. 543, 546, 548, 558, 561, 566) On at least one occasion, Brewer reported definite improvement that allowed her to do her housework slowly. (Tr. 558) At other times, Brewer complained of pain in her joints or body, a flare up of rheumatoid arthritis, or reported that the prescribed medications were not working or were causing side effects. (Tr. 544, 549, 554, 561, 563, 567, 653) Dr. Chaitoff prescribed treatments including ultrasound-guided injection of methylprednisolone (Tr. 545, 551, 562), Azathioprine, Enbrel, Prednisone, Actemra, Roxicodone, Cymbalta, Simponi, and Voltaren gel. (Tr. 543-546, 548) Dr. Chaitoff also had Brewer's blood tested with the Vectra DA test. (Tr. 550, 559)

### C. Opinion Evidence

#### 1. Dr. Eulogio Sioson – Consultative Examiner

On April 18, 2013, Eulogio Sioson, MD, CIME performed a disability evaluation regarding Brewer's diabetes mellitus, mental condition, and pain in her neck, back, and joints. (Tr. 314) Dr. Sioson noted Brewer reported severe stiffness and pain in the morning and constant pain in her hips, knees, and ankles after walking five minutes, going up and down five steps, standing for ten minutes, or sitting for fifteen minutes. (Id.) Brewer said she could not do any household chores because of pain and weakness in her joints. (Id.) She reported she could dress, groom, shower, button, tie, and grasp, but with difficulty due to the pain in her shoulders, wrists, and hands. (Id.) Brewer reported she had surgeries for "trigger fingers 2nd to 4th" in her left hand in 2010 and in her right hand in 2011. (Id.) Brewer reported neck pains she believed were caused by her frozen shoulders. (Id.) Brewer reported mild back aches and no history of fracture, dislocation, or herniated discs. (Id.) Brewer reported that she was taking oxycodone, Humira, and prednisone. (Id.)

7

With regard to Brewer's mental disorder, Dr. Sioson stated Brewer had 14-year history of depression. (Tr. 314) Brewer reported that she had poor sleep, normal appetite, weight gain, occasional memory and concentration problems, and she felt tired and hopeless. (Id.) Brewer had not been hospitalized for her mental disorder and had no suicidal thoughts or attempts. (Id.) Brewer reported that she did not think her medication was helping. (Id.) Dr. Sioson also noted Brewer's 30-year history of diabetes mellitus and hyperthyroidism. (Id.)

Dr. Sioson observed that Brewer walked normally with no assistive device and was able to get up and down from the examination table, do heel/toe walking, but a declined to squat because of knee pain. (Tr. 315) Dr. Sioson observed Brewer had moderate lower back tenderness, tenderness and limited range of motion in both shoulders, right wrist, and left knee, and no apparent effusion or gross instability. (Id.) Brewer had no heat, redness, swelling, subluxation, or gross deformity in her joints. (Id.) Dr. Sioson observed Brewer was able to grasp and hold a 1.6 lb. dynamometer, even though she experienced pain in her right wrist and fingers when gripping the dynamometer, and she could manipulate with each hand, wrote legibly, was able to handle a clipboard and personal items, and tie shoes. (Id.) Straight leg raising while sitting was negative, but while lying down there was some pain in the top right of Brewer's thigh. (Id.) Brewer had tingling numbness in her right second to fourth fingers and manual muscle testing was affected by pain. (Id.) Dr. Sioson requested manual muscle testing and range of motion testing. (Id.)

Dr. Sioson also observed that Brewer was alert, coherent, oriented, cooperative, and displayed no abnormal behavior or appearance. (Tr. 315) Dr. Sioson's impression was that Brewer "was not emotionally labile and was able to maintain attention and concentration." (Id.)

Dr. Sioson did not observe deformity or subluxation, despite Brewer's alleged history of rheumatoid arthritis and neck, back, and joint pains. (Id.) Dr. Sioson concluded that Brewer would be limited to sedentary work, due to the limitations on her range of motion from pain and the above findings. (Id.)

### 2. Adi A. Gerblich, M.D. – Consultative Examiner

On December 4, 2013, Dr. Adi Gerblich issued a disability evaluation of Brewer and her complaints of rheumatoid arthritis, fibromyalgia, diabetes mellitus, hypothyroidism, and depression. (Tr. 343) Dr. Gerblich noted that Brewer's right shoulder had limitation with flexion to 90 degrees and abduction to 90 degrees; however, external and internal rotation and extension were normal. (Tr. 344) Brewer's left shoulder, elbow, wrist, fingers, hips, knees, and ankles all had a normal range of motion. (Id.) Brewer's dorsolumbar range of motion was limited, with flexion to 60 degrees and extension to about 10 degrees. (Id.) Dr. Gerblich also noted that Brewer had difficulty walking from the parking lot to his office because of knee pain. (Id.) Dr. Gerblich stated Brewer could not climb any flights of stairs but noted that she dressed herself. He further noted that the laundry, cooking, and shopping were done by her husband. (Id.)

Dr. Gerblich's evaluation was based on Dr. Sioson's documents describing Brewer's diabetes mellitus, mental disorder, and rheumatoid arthritis. (Id.) Dr. Gerblich concluded that Brewer was a chronic diabetic with progressive rheumatoid arthritis. (Tr. 345) Dr. Gerblich concluded that his examination did not indicate Brewer would be limited to sedentary activity, because Brewer's "pain with mobility, according to her history, is significant but cannot be ascertained objectively." (Tr. 345) Rather, Dr. Gerblich stated he suspected Brewer's rheumatoid arthritis medication needed to be adjusted further to give Brewer pain relief. (Id.)

### 3.    Dr. Chaitoff – Treating Physician

On April 30, 2014, Dr. Chaitoff issued the first of two medical source statements regarding Brewer's physical capacity.  (Tr. 467)  Dr. Chaitoff found that Brewer could only occasionally lift 5 lbs., walk or stand for a total of thirty minutes, and sit for two hours, because of her rheumatoid arthritis, arthritis of the wrists and knees, pain in the knees, left knee effusion, and water on the knee.  (Id.)  Dr. Chaitoff found that Brewer's ability to stand and walk were affected by her impairment, and she was able to walk or stand without interruption for thirty minutes.  (Id.)  Dr. Chaitoff stated that his finding was supported by Brewer's rheumatoid arthritis, arthritis of the wrist and knees, and left knee effusion.  (Id.)  Dr. Chaitoff determined that Brewer could rarely climb, balance, stoop, crouch, knee, or crawl, because of her knee conditions.  (Id.)  Dr. Chaitoff found that Brewer could rarely reach, push, or pull and could only occasionally do fine or gross manipulation, based on the medical finding of arthritis in Brewer's wrists and that "[h]er daughter had to brush her teeth."  (Id.)  Dr. Chaitoff found that environmental restrictions did not affect Brewer's impairment.  (Id.)  Dr. Chaitoff noted that Brewer had been prescribed a cane, breathing machine, oxygen, and wrist splints.  (Id.)  Dr. Chaitoff noted that Brewer experienced severe pain, but did not need to elevate her legs at will.  (Id.)  Dr. Chaitoff also stated that, during an average eight-hour workday, Brewer would require five hours of additional rest time.  (Id.)  Dr. Chaitoff listed sleep apnea as an additional limitation that would interfere with an eight-hour workday.  (Id.)

Dr. Chaitoff also prepared a medical source statement regarding Brewer's mental capacity on April 30, 2014.  (Tr. 465)  He found Brewer could constantly: follow work rules; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to co-workers; interact with

supervisor(s); work in coordination with or proximity to others without being distracted; understand, remember, and carry out job instructions, whether simple or complex; maintain her appearance; behave in an emotionally stable manner; relate predictably in social situations; manage funds or schedules; and leave home on her own.  (Tr. 465-66)  Dr. Chaitoff found Brewer could frequently: follow work rules; maintain attention and concentration for extended periods of two hour segments; function independently without redirection; and socialize.  (Id.) He found Brewer could only occasionally deal with work stress and could only rarely complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 465)  Dr. Chaitoff stated that the diagnoses of "major depression" and "generalized anxiety disorder" supported his assessment.  (Tr. 466)

On October 1, 2015, Dr. Chaitoff completed a second medical source statement regarding Brewer's physical capacity.  (Tr. 660)  In this evaluation, he found that Brewer could only occasionally lift 5 lbs., but she could walk or stand for a total of two hours, and sit for six hours, based on medical findings including Brewer's arthritis in her hand, shoulder, and knees and pain in her hip and knees.  (Id.)  Dr. Chaitoff found that Brewer's ability to stand and walk were affected by her impairment and that she was able to walk or stand without interruption for thirty minutes.  (Id.)  Dr. Chaitoff stated that his finding was supported by Brewer's rheumatoid arthritis, arthritis of the wrist and knees, and left knee effusion.  (Id.)  Dr. Chaitoff found that Brewer could only rarely climb, crouch, kneel, crawl, push/pull, or perform gross manipulation. (Tr. 660-61)  He found that Brewer could occasionally balance, stoop, reach, or perform fine manipulation.  (Id.)  Dr. Chaitoff based these findings on Brewer's arthritis in her knees, shoulders, hands, and feet.  (Id.)  Dr. Chaitoff found Brewer's balance and gait were affected by

environmental restrictions including heights and moving machinery. (Tr. 661) Dr. Chaitoff noted that Brewer had been prescribed a cane, walker, and wheelchair. (Id.) He indicated Brewer needed to be able to alternate positions between sitting, standing, and walking at will. (Id.) He also indicated that Brewer's pain was severe and interfered with her concentration and could take her off task, but should not cause absenteeism. (Id.) Dr. Chaitoff noted that Brewer did not need to elevate her legs at will. He indicated Brewer would require an additional two hours of rest time on an average work day. (Id.) He stated that Brewer would miss at least five days of work per month. (Id.)

Dr. Chaitoff also completed a second mental capacity medical source statement on October 1, 2015. (Tr. 662-63) In this opinion, Dr. Chaitoff stated that Brewer could constantly: follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; function independently without redirection; work in coordination with or proximity to others without being distracted or distracting; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; she could understand, remember, and carry out job instructions, whether simple or complex; maintain her appearance; socialize; behave in an emotionally stable manner; relate predictably in social situations; manage funds and/or schedules; and leave her home on her own. (Id.) Dr. Chaitoff stated that Brewer could frequently maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisor(s); and deal with work stress. (Id.) Dr. Chaitoff based his opinion on Brewer's rheumatoid arthritis and diabetes mellitus. (Tr. 663)

####     4.     Jeff Rindsberg, Psy. D – Consultative Examiner

On March 22, 2013, Dr. Rindsberg, performed a clinical evaluation at the request of the state agency to determine whether Brewer had any mental disorders or diagnoses.  (Tr. 308)  Brewer drove herself to the appointment.  Dr. Rindsberg considered several sources of information, including a clinical interview with Brewer and a disability report and a function report provided by the state agency.  (Tr. 309-310).  Although Brewer raises no argument concerning the handling of her mental health status, the following is included from Dr. Rindsberg's records because it pertains to her functional capabilities.

With regard to her activities of daily living, Brewer reported that she would lie for an hour in the morning to wake up, stretch, and "deal with the pain."  (Tr. 310)  Brewer reported she could dress herself "'sometimes' but gets her daughter's help."  (Id.)  Brewer had no trouble handling money or attending to her hygiene.  (Id.)  She also drove herself places, but "hardly [did] that because of her shoulder problems."  (Id.)  Brewer reported she had not recently socialized and didn't want to go shopping because of her pain; her husband or daughters would do the shopping, household chores, and the cooking.  (Id.)  Brewer claimed that she did nothing for fun and when at home she was either in bed or on the couch.  (Id.)

Dr. Rindsberg noted Brewer was cooperative and "seemed to have a decent degree of concern about her appearance."  (Id.)  Dr. Rindsberg observed that there was no difficulty with Brewer's expressive or receptive language skills and her "speech was of appropriate rate, tone, and volume," her language was logical and goal oriented, and "her intelligibility was 100%."  (Id.)  Dr. Rindsberg observed Brewer appeared "somewhat depressed but may have also been in pain."  He found no overt anxiety evident for Ms. Brewer.  (Id.)  Dr. Rindsberg also noted that Brewer was "oriented to person, place, and time" and her immediate, short, and long-term recall

13

of three items was perfect. (Tr. 311) He concluded that Brewer was of at least average intelligence and had no major cognitive deficits. (Id.) Dr. Rindsberg also found Brewer's insight and judgment were fair. (Id.) Dr. Rindsberg concluded Brewer met the criteria for major depressive disorder and pain disorder associated with both psychological factors and her generalized medical condition. (Id.) He assigned Brewer a GAF score of 48 because he considered Brewer's pain and impairment to both be serious. (Id.)

In his functional assessment, Dr. Rindsberg found Brewer should be able to understand, remember, and carry out instructions, despite her pain. (Id.) Dr. Rindsberg found Brewer should be able to perform simple tasks, even though her ability to maintain attention and concentration were affected by her pain and depression. (Id.) Dr. Rindsberg found Brewer's pain could affect her ability to carry out multi-step tasks or handle pressure in a work environment. (Tr. 311-12) Dr. Rindsberg also found dealing with people was a problem because of Brewer's depression and lack of energy and desire to interact socially. (Tr. 311) Dr. Rindsberg found that Brewer should be able to effectively and independently manage funds. (Tr. 312)

### 5. Dr. Hershel Pickholtz – Consultative Examiner

On October 30, 2013, Dr. Pickholtz performed a clinical interview of Brewer to assess her mental status and capacity at the request the state agency. (Tr. 487) Brewer reported she had experienced some level of depression for fourteen years. (Tr. 489) She was taking psychiatric medications prescribed by her diabetic doctor. Dr. Pickholtz found that Brewer experienced affective symptoms that were within the moderate to severe range of impairment. (Id.) Brewer indicated that she cried and felt like giving up and had no motivation or desire to do much. (Id.) Brewer reported she had not experienced any anxiety, post-traumatic stress, or visual or auditory hallucination complaints. (Id.)

14

Dr. Pickholtz noted Brewer was compliant throughout the evaluation, had no difficulty understanding and responding to his questions, and made appropriate and consistent eye contact throughout the evaluation. (Tr. 490) Dr. Pickholtz found Brewer's verbalizations to be easily understood, intelligible, logical, coherent, relevant, and goal directed. (Id.) He found Brewer had average capacity for associative thinking and cognitive functioning with no sign of formal thought disturbance. (Id.) Dr. Pickholtz described Brewer's affect as "somewhat constricted" and her mood as "somewhat depressed." (Id.) Brewer indicated that she still experienced some depression, but denied having anxiety or homicidal or suicidal ideation. (Id.) Brewer indicated that she became depressed when she experienced a lot of pain. (Tr. 491)

With regard to her daily activities, Brewer reported she took care of her hygiene and changed clothing daily, but she showered with her husband's assistance. (Tr. 481-92) Brewer stated she did not vacuum, mop, sweep floors, do the laundry, iron, or shop for food or clothing, but she did cook dinner three times a month. (Tr. 492) Brewer operated a TV, used a computer, and talked to her mother by phone daily. (Id.) She read magazines and the newspaper. (Id.) During the day, Brewer reported that she usually slept, lay, on the couch watching TV, talked to her family, and ate. (Id.) Brewer reported she could not feed herself. (Id.) She also stated that she socialized with relatives eight times a year, did not socialize with friends very often, and did not attend religious services. (Id.)

Dr. Pickholtz concluded that Brewer's psychiatric complaints were moderate in severity. (Id.) He also found that her work functioning was "somewhat impaired" by her psychiatric complaints. (Id.) He diagnosed Brewer with moderate Major Depressive Disorder, single episode, without psychotic features. (Id.) Dr. Pickholtz noted that Brewer's psychosocial

stressors included unemployment and economic problems, other psychological stressors related to psychiatric and physical conditions, and lack of psychiatric treatment. (Id.)

In his functional assessment, Dr. Pickholtz found Brewer had, at worst, slightly impaired capacities to understand, remember, and carry out instructions. (Tr. 493) He found Brewer had average to low average capacity for attention and concentration and her capacity to perform one to three-step tasks for work was only slightly impaired in comparison to what she did in the past. (Id.) Dr. Pickholtz found Brewer's capacity to relate to coworkers and others fell within the somewhat impaired range of impairment, at worst. (Id.) He also found Brewer's capacity to handle the stresses and pressures of work was somewhat impaired, at worst, and that Brewer would benefit from a psychiatrist's evaluation and treatment. (Id.)

### D. Testimonial Evidence

#### 1. Claimant's Testimony

At the November 19, 2015 hearing, Brewer testified that she selected May 19, 2012 as the date she became disabled because it was the day the store where she had worked had closed. (Tr. 43) Brewer stated she had considered not working as early as 2010 and 2011 because of her rheumatoid arthritis pain, even before she learned the store was closing. (Tr. 44) Brewer stated that after the store closed, she looked for work and went to the hospital in September for ketoacidosis. (Tr. 43) Brewer stated that she began having problems and pain after being released from the hospital, and in November, 2012 she was diagnosed with rheumatoid arthritis. (Tr. 44)

Brewer testified that she could not have worked even a day after the store closing because it was very hard for her to work a full day. (Id.) Prior to May 19, 2012, Brewer had worked 40 hours a week, from 8:00 AM until 5:00 PM. (Id.) Brewer testified that while working, her legs

hurt and she could barely walk after sitting down at home, at lunch, or on her breaks. (Tr. 45) Brewer's hand pain prevented her from counting money. (Id.) She testified that she had surgery for trigger finger on her left hand in August, 2010 and on her right hand in August, 2011. (Tr. 47) Brewer stated that her problems with her hands improved after two months of physical therapy and the assistance of different devices. (Tr. 49)

Brewer testified she had several limitations because of her pain. She stated she had a hard time lifting a remote control. (Tr. 50) She stated that getting dressed and using the bathroom were problems. (Id.) Brewer testified her daughter had to help her get dressed or brush her teeth or hair. (Id.) Brewer stated her daughters or husband would have to help her use the bathroom or get out of bed when she experienced bad flare ups. (Tr. 50, 53) Brewer said that her daughters or husband also had to do the laundry and grocery shopping. (Tr. 59) Brewer testified she couldn't open anything, because of reduced strength and pain. (Tr. 53) Brewer testified she could not go up and down stairs or lift anything. (Tr. 58) Brewer stated she could not use a keyboard or count money. (Tr. 59) She stated that she would only feel "decent" on eight out of the thirty days in a month. (Tr. 51) Brewer testified her flare ups were triggered by physical or emotional stress, would make her stay in bed for three or four days at a time, and left her very feeling very weak. (Id.) Brewer indicated that during her flare-ups she would experience sharp, excruciating pain in the affected body part, usually her shoulders, hands, knees, or feet. (Tr. 50-51) Brewer testified that, on a scale of zero to ten, her pain on an average day was a seven or an eight. (Tr. 51-52)

Brewer testified she had taken methotrexate, but was prescribed azathioprine after she had an adverse reaction to methotrexate. (Tr. 51) She stated that she took azathioprine for approximately seven or eight months before her doctor stopped the treatment due to Brewer's

low white blood cell count.  (Id.)  Brewer testified Dr. Chaitoff prescribed a cane, wheelchair, and a two-handed walker with wheels, to her for her rheumatoid arthritis.  (Tr. 53)

Brewer testified that she can stand for eight to ten minutes and can walk for five minutes before she has to sit down.  (Tr. 54)  She stated she usually uses her walker for support when standing.  (Tr. 55)  Brewer testified she experienced swelling in her hands and feet and she had swelling and fluid on her right knee that had to be drained.  (Id.)  Brewer stated she used compression gloves for both hands, a compression sleeve on her right elbow, and a knee brace, as needed.  (Tr. 56)

Brewer testified she could lift her arms chest high, but could not lift her arms over her head.  (Id.)  She stated she did seven sessions of physical therapy, at home exercises, and received cortisone shots to treat her frozen shoulder condition.  (Tr. 55-56)

Brewer testified that she had not seen a psychiatrist, psychologist, or counselor for depression, even though her diabetic doctor recommended that she do so. (Tr. 59-60)  She said she had been taking psychiatric medication, such as Wellbutrin and Cymbalta, for probably 16 years.  (Tr. 60)

Brewer testified that she had worked as a customer service manager for four years.  (Tr. 63)  In that position, Brewer stated she stocked shelves and sometimes lifted 59 lb. objects  (Tr. 63-64)  Brewer testified had worked as a cashier, office worker, did customer service, and supervised cashiers in her customer service manager position.  (Tr. 64)  Brewer testified that while working as a telephone solicitor, she spent most of her time sitting and she did not lift anything heavy.  (Tr. 66)  Her telephone solicitor position involved data entry.  (Id.)

The ALJ questioned Brewer regarding the source of the information in Dr. Chaitoff's medical source statements.  (Tr. 76)  Brewer stated that she and Dr. Chaitoff went over the

medical source statement forms together, and she gave answers to which Dr. Chaitoff agreed or disagreed.  (Tr. 77)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. Id.

## V.     The ALJ's Decision

The ALJ's January 27, 2016 decision contained the following paraphrased findings:

1. Brewer last met the insured status requirements of the Social Security Act on June 30, 2014 (Tr. 19);

2. Brewer did not engage in substantial gainful activity during the period from her alleged onset date of May 19, 2012 through her date last insured of June 30, 2014. (20 CFR 404.1571 *et seq.*) (Tr. 19);

3. Through the date last insured, Brewer had severe impairments of: rheumatoid arthritis, tendinitis, diabetes mellitus, hypothyroid disease, and major depressive disorder. (20 CFR 404.1520(c)) (Tr. 19);

4. Through the date last insured, Brewer did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (Tr. 20);

5. After careful consideration of the entire record, the ALJ found that, through the date last insured, Brewer had the residual functional capacity to perform light work as defined in 20 CFR 404. 1567(b) except she could never climb ladders, ropes, and scaffolds, but could have occasionally climbed ramps and stairs. She could occasionally balance, stoop, kneel, crouch, and crawl. She could occasionally handle, finger, and feel bilaterally. She could never reach overhead, but may have occasionally reached forward. Brewer could sustain multi-step tasks in a static setting without strict requirements for fast pace or quotas. She could have interacted with others superficially,

20

meaning the job could not have required arbitration, negotiation, conflict resolution, management or supervision of others, or responsibility for the health, safety, or welfare of others. Brewer could have adjusted to occasional changes (Tr. 22, 23);

6.  Through the date last insured, Brewer was unable to perform any past relevant work (20 CFR 404.1565) (Tr. 27);

7.  Brewer was born on April 10, 1974, and was 40 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563) (Tr. 28);

8.  Brewer has a limited education and is able to communicate in English (20 CFR 404.1564) (Tr. 28);

9.  Transferability of job skills is not material to the determination of disability because using the Medical- Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not Brewer has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (Tr. 28);

10. Through the date last insured, considering Brewer's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Brewer could have performed. (20 CFR 404.1569 and 404.1569(a)) (Tr. 28);

11. Brewer was not under a disability, as defined in the Social Security Act, at any time from May 19, 2012, the alleged onset date, through June 30, 2014, the date last insured (20 CFR 404.1520(g)) (Tr.29).

Based on these findings, the ALJ determined that Brewer was not disabled through June 30, 2014, the last date insured. (Tr. 29)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999). "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. If not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. The ALJ Properly Evaluated the Opinion of Dr. Chaitoff

Brewer argues the ALJ erred by giving only "little" or "some" weight to the opinions of Dr. Chaitoff, Brewer's treating physician, without providing "good reasons" for the decision. ECF Doc. 12; Page ID# 758-59. Brewer argues that Dr. Chaitoff's opinions should have received great deference because "he had an unusually long treating relationship with Plaintiff and his findings were well based and consistent with treatment records." Id. at 759.

The Commissioner counters that "[t]he ALJ considered Dr. Chaitoff's medical source statements, but found them inconsistent with other substantial evidence." ECF Doc. 13, Page ID# 779. The Commissioner argued the ALJ gave Dr. Chaitoff's April 2014 assessment little weight because it "appeared to reflect Plaintiff's subjective complaints rather than objective testing" and noted that "Plaintiff testified that she and Dr. Chaitoff completed the form together, and she 'gave answers' which Dr. Chaitoff reviewed." (Id.) at 779-780 (quoting Tr. 77).

Evidence from doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). The ALJ must examine what work the treating source performed. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If an ALJ does not give the treating source opinion controlling weight, the ALJ must use several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 416.927(c). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); *see also Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

Id. at 377. Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." Id. (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)). However, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.* 414 F. App'x. 802, 804 (6th Cir. 2011).

Here, Dr. Chaitoff prepared initial medical source statements regarding Brewer's physical and mental capacities on April 30, 2014. (Tr. 465, 467) Dr. Chaitoff also completed a second set of medical source statements on October 1, 2015. (Tr. 660-63)

Dr. Chaitoff's initial medical source statement regarding Brewer's mental capacity indicated, among other things, that Brewer would only rarely be able to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without rest periods of unreasonable number or length, and would only occasionally be able to deal with work stress. (Tr. 465) However, in his subsequent medical source statement regarding Brewer's mental capacity, Dr. Chaitoff indicated that Brewer would constantly be able to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace and that she would frequently

be able to deal with work stress. (Tr. 660) Overall, Dr. Chaitoff's opinion showed an improvement in Brewer's mental capacity in many areas, including her ability to socialize, maintain attention and concentration, and follow work rules. (Tr. 465, 662)

Dr. Chaitoff's initial and subsequent medical source statements regarding Brewer's physical capacity also showed an improvement in Brewer's condition. (Tr. 467-68, 660-61). Dr. Chaitoff's initial 2014 opinions indicated, among other things, that Brewer could only occasionally carry 5 lbs., stand or walk for 0.5 hours, sit for two hours, rarely climb, balance, stoop, crouch, kneel, crawl, reach and push/pull, and only occasionally perform fine or gross manipulations. (Tr. 467-68) Dr. Chaitoff also stated that Brewer's pain would cause absenteeism and that she would require on average five hours of rest time per day. (Tr. 468). However, in his October 1, 2015 assessment, Dr. Chaitoff indicated that Brewer could stand or walk for a total of two hours per day or thirty minutes without interruption, sit for six hours total or one hour without interruption, occasionally balance, stoop, reach or perform fine manipulation, and could only rarely climb, crouch, kneel, crawl, push/pull, or perform gross manipulation. (Tr. 660-61) Dr. Chaitoff also indicated Brewer's pain would not cause absenteeism and Brewer would only require two hours of additional rest time on an average day, but he again opined that Brewer would miss at least five days of work each month. (Tr. 661)

The ALJ accorded little weight to Dr. Chaitoff's initial mental health and physical opinions, stating:

> In reaching this conclusion, I note the claimant's hearing testimony that she and Dr. Chaitoff discussed the information contained on the forms and that he noted her subjective complaints. . . .Thus, I find Dr. Chaitoff's opinions merely duplicative of the claimant's testimony and not based on any psychological testing or functional capacity evaluations.

(Tr. 26-27)  The ALJ accorded "some weight" to Dr. Chaitoff's October 1, 2015 opinion, because the ALJ found these opinions reflected Brewer's and Dr. Chaitoff's belief that Brewer's symptoms had improved with treatment:

> Although I continue to note the claimant's hearing testimony regarding Dr. Chaitoff's reiteration of her subjective complaints, he [*sic*] nevertheless finds Dr. Chaitoff's opinion reflects some improvement in the claimant's functionality.  Specifically, the [*sic*] Dr. Chaitoff found the claimant was capable of sitting and performing some postural activity for a greater duration.

(Tr. 27)  The ALJ also stated that he accorded Dr. Chaitoff's later opinion "substantial weight" and noted the "updated opinion significantly differs from Dr. Chaitoff's prior medical opinion regarding the claimant's mental health, but coincides with the objective medical record."  (Tr. 26)

Brewer complains that the ALJ erred the weight he assigned to Dr. Chaitoff's medical opinions because the opinions "are supported by objective medical testing and years of treatment records" and are not merely duplicative of Brewer's subjective complaints.  ECF Doc. 12, Page ID# 759.  Brewer argues: "Dr. Chaitoff's opinions were corroborated by several ultrasounds and blood work.  Id.  Brewer also argues that the ALJ also failed to weigh Dr. Chaitoff's opinions using the factors in 20 C.F.R. § 404.1527(d)(2).  (Id.) at 761.

The ALJ provided good reasons for assigning limited weight to Dr. Chaitoff's initial opinions and substantial weight to Dr. Chaitoff's later opinions.  Substantial evidence supports the ALJ's finding that Dr. Chaitoff's later opinions were more consistent with the medical record, and also with Brewer's functional improvements over time.  (Tr. 26)

The ALJ found that many of Brewer's allegations conflicted with other evidence in the medical record.  (Tr. 24-25)  The ALJ noted that although Brewer said she experienced chronic musculoskeletal pain from her rheumatoid arthritis, physicians' examinations of Brewer's

extremities and spine generally resulted in normal findings. (Tr. 24, citing Tr. 237, 314-15, 344, 393, 472) Also, "[a]lthough [Brewer] demonstrated limited range of motion in her shoulders, right wrist, and left knee, there was no effusion, gross instability, heat, redness, swelling, subluxation, or gross deformity in her joints." (Tr. 24 citing 315, 344) On September 2012, Brewer demonstrated "full range of motion, sensation, and motor function in her extremities, despite findings of left knee degenerative joint disease and left shoulder bursitis." (Tr. 24 citing Tr. 237, 255, 262, 266-68, 272, 392-395) On April 18, 2013, Brewer was able to walk normally with no assistive device, do heel/toe walking and declined squats, and get up and down from an examination table. (Tr. 315) The ALJ noted that on multiple occasions in 2013 and 2014, doctors observed that Brewer's straight leg raise tests were negative; and her gait, deep tendon reflexes, and motor function were normal; and she failed to display atrophy or peripheral edema. (Tr. 24 citing 344, 393-95, 399, 401) The ALJ also noted other evidence in the record that was inconsistent with Brewer's claimed upper extremity symptoms and hearing testimony, including Brewer's admissions to consultative examiner Dr. Sioson that she maintained the ability to dress, groom, shower, button, tie, and grasp. (Tr. 24 citing Hearing Testimony and Tr. 314) On March 27, 2014, Brewer denied having serious difficulty walking, climbing stairs, dressing, or bathing. (Tr. 25 citing Tr. 445) The ALJ also found that Brewer's rheumatoid arthritis responded well to treatment. (Tr. 25 citing Tr. 543; 546) The ALJ further noted that by 2014, Brewer experienced only infrequent rheumatoid arthritis flare-ups, which were generally controlled with medication. He noted that she was even able to go on a Caribbean cruise in 2015 and only experienced pain in her feet toward the end of the cruise. (Tr. 25, 655, 658). Consequently, substantial evidence supports the ALJ's conclusion that Brewer's rheumatoid arthritis symptoms are not as debilitating as alleged. (Tr. 25)

Generally, "[a]n ALJ's findings based on credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)). An ALJ may reject medical opinions based on a claimant's self-reports [when] the reports themselves lack credibility or where the claimant is not credible." *Wyatt v. Colvin*, No. 12-CV-289, 2013 WL 4080718, at *4 (S.D. Ohio Aug. 13, 2013). Further, "[t]he mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment." *See Taylor v. Comm'r of Soc. Sec. Admin.*, No. 14CV686, 2015 WL 4730716, at *3 (N.D. Ohio Aug. 10, 2015) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.1990)). The court must defer to the ALJ's credibility determination, and that determination, in turn, provided substantial evidence for the decision to discount the initial opinions of Dr. Chaitoff.

In addition, the ALJ relied upon and accorded significant weight to the opinion of the state agency consultative medical examiner, Dr. Adi Gerblich. (Tr. 26) The ALJ noted that Dr. Gerblich found that Brewer was not limited to sedentary exertion, despite Brewer's subjective pain complaints. (Id., citing Tr. 344-45). The ALJ found Dr. Gerblich's opinion was consistent with his objective findings and the longitudinal medical record. (Tr. 26) Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. This provided substantial evidence to discount Dr. Chaitoff's initial opinions.

The ALJ's explanation demonstrates that he properly considered the regulatory factors and discounted Dr. Chaitoff's initial opinions because of the inconsistency of the opinions with the record as a whole and with Dr. Chaitoff's later assessments of Brewer's mental and physical

capacities. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ therefore provided good reasons for

assigning less than controlling weight to Dr. Chaitoff's initial opinions, and he fulfilled his

obligation to provide good reasons for the weight assigned, as required by the regulations. *See,*

*e.g. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

> C.    The ALJ Properly Evaluated Brewer's
>        Physical Condition under Listing 14.09

Brewer argues the ALJ erred at Step Three of his sequential analysis when he neglected

to adequately analyze whether Brewer met or was functionally equivalent to the requirements of

Listing 14.09, concerning inflammatory arthritis. ECF Doc. 12; Page ID# 762; *see* 20 C.F.R. Pt.

404, App'x 1, § 14.09. The Commissioner counters that the ALJ correctly found that Brewer's

symptoms were not severe enough to satisfy Listing 14.09. ECF Doc. 13, Page ID# 781.

The Listing "describes, for each of the major body systems, impairments which are

considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. §

404.1525. A claimant's impairment must meet every element of a Listing before the

Commissioner may conclude that he or she is disabled at Step Three. 20 C.F.R. § 404.1520; *see*

*also Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.1986). The

claimant has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health &*

*Human Servs.*, 742 F.2d 968, 974 (6th Cir.1984). The regulations provide that in making a

medical equivalence determination, the Social Security Administration will "consider the

opinion given by one or more medical or psychological consultants designated by the

Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a . . . record

. . . complete and detailed enough to enable the Secretary to make a disability determination rests

with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th

Cir.1986). The court may look to the ALJ's decision in its entirety to justify the ALJ's Step

Three analysis. *See Snoke v. Astrue*, 10-cv-1178, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *See Reynolds*, 2011 WL 1228165 at * 4–5; *Marok v. Astrue*, 5:08CV1832, 2010 WL 2294056 at *3 (N.D. Ohio Jun.3, 2010); *Waller v. Comm'r of Soc. Sec.*, 1:12–cv–00798, 2012 WL 6771844 at * 3 (N.D. Ohio Dec.7, 2012) *adopted by Waller v. Comm'r of Soc. Sec.*, No. 1:12-CV-0798, 2013 WL 57046 (N.D. Ohio Jan. 3, 2013); *Keyes v. Astrue*, 1:11-cv-00312, 2012 WL 832576 at * 5–6 (N.D. Ohio March 12, 2012).

Listing 14.09(A) provides for a finding of disability when a claimant suffers from inflammatory arthritis with "persistent inflammation or deformity of one or more major peripheral weight-bearing joints resulting in an inability to ambulate effectively (as defined in 14.00C6)," or "[o]ne or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7)." 20 C.F.R. Part 404, Subpt. P, App. 1, § 14.09(A). The Regulations define an inability to perform fine and gross movements effectively as:

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Part 404, Subpt. P, App. 1, § 100(B)(2)(c).

Here, the ALJ's Listing 14.09 analysis tracked the regulatory language:

Listing 14.09 was not met because the record does not document: (A) persistent inflammation or deformity of a major weight bearing joint resulting in the inability to ambulate, or involvement of a major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively; (B) inflammation or deformity in one or more major joint with involvement of two or more organs/body system with one of the organs/body system involved at least to a moderate level of severity, and at least two constitutional symptoms or signs; (C) ankylosing spondylitis or other spondyloarthropathies; or (D) repeated manifestations of inflammatory arthritis with at least two constitutional symptoms or signs, and one of the following markedly limited: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

(Tr. 20-21)

Brewer does not argue that her rheumatoid arthritis causes an inability to ambulate within the meaning of Listings, so it is unnecessary to address Listing 14.09(A)(1). Rather, Brewer focuses on Listing 14.09(A)(2), arguing that the record evidences persistent inflammation of numerous major peripheral joints, including most notably Brewer's shoulder joints, which limit the range of motion in her arms. ECF Doc. 12; Page ID# 764. Brewer may experience pain and inflammation in her joints, but the decisive issue is whether the inflammation makes her unable to perform fine or gross movements effectively. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 14.09(A)(1); *see also Adams v. Astrue*, No. 3:10-CV-180, 2011 WL 2559541, at *4 (S.D. Ohio June 28, 2011) ("That Plaintiff has severe foot problems is not for debate[; however a]t issue is whether his foot problems meet the strictures of [the Listings].").

The portions of the record to which Brewer cites generally do not support her arguments regarding the limited range of motion in her arms or her inability to use her upper extremities. *See, e.g.* Tr. 392 (ultrasound of Brewer's shoulder found largely normal results, including no

tendinosis, tendinous ruptures, or fluid accumulations); Tr. 393 (noting motor function was normal proximally and distally); Tr. 396 (noting motor function was normal proximally and distally); Tr. 543 (noting Brewer's joints had no synovitis, deformity, or impaired range of motion); Tr. 643 (noting Brewer's extremities had normal range of motion); Tr. 344 (noting Brewer's left shoulder, elbow, wrist, and fingers all had normal range of motion and Brewer's hand grasp and manipulation were normal). Brewer only points to one instance in the medical record where a physician found diminished range of motion in both her upper extremities. *See* Tr. 395; *see also* Tr. 344 (finding a limited range of motion in Brewer's right shoulder, but full range of motion in her left). As the Commissioner correctly notes, at most, the record shows that Brewer experienced intermittent problems in various joints, but retained normal or near normal motor function. (Tr. 393, 394, 395, 396, 399, 560)

Brewer also argues that both of Dr. Chaitoff's medical source statements regarding her physical capacity indicated that she could only perform fine manipulation or gross manipulation occasionally to rarely. ECF Doc. 12, Page ID# 764 (citing Tr. 661, 468). However, as discussed above, substantial evidence supports the ALJ's decision to discount Dr. Chaitoff's medical source statements. *See* Section VI(A) above. Further, consulting examiner Dr. Gerblich found Brewer's "[h]and grasp and manipulation are normal." (Tr. 344) Moreover, consultative examiner Dr. Sioson observed Brewer was able to grasp and hold a 1.6 lb. dynamometer, even though she experienced pain in her right wrist and fingers when gripping the dynamometer, and she could manipulate with each hand, wrote legibly, was able to handle a clipboard and personal items, and tie shoes. (Tr. 315) Brewer reported to Dr. Sioson that she could dress, groom, shower, button, tie, and grasp, but with difficulty due to the pain in her shoulders, wrists, and hands. (Tr. 314) Further, as set forth above, substantial evidence supports the ALJ's conclusion

that Brewer's rheumatoid arthritis flare-ups were not as debilitating as alleged.  Thus, Brewer's

condition does not rise to the level of "*persistent* inflammation of one or more major peripheral

joints in *each* upper extremity resulting in an *inability* to perform fine and gross movements

effectively" or an extreme loss of function of both upper extremities as is required to meet

Listing 14.09(A)(2).  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 14.09(A)(2) (emphasis added).

Brewer also did not sustain her burden of establishing that the symptoms from which she

suffers meet or medically equal the elements in Listing 14.09(D).  *See Foster v. Halter*, 279 F.3d

348, 354 (6th Cir. 2001) ("a claimant has the burden of demonstrating that her impairment meets

or equals a listed impairment").

Listing 14.09(D) provides for a finding of disability when a claimant suffers from

[r]epeated manifestations of inflammatory arthritis, with at least two of the constitutional
symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the
following at the marked level:
    1. Limitation of activities of daily living.
    2. Limitation in maintaining social functioning.
    3. Limitation in completing tasks in a timely manner due to deficiencies in concentration.

20 C.F.R. Part 404, Subpt. P, App. 1, § 14.09(D).  The Regulations explain that listing-level

severity is shown in 14.09(D) by:

Inflammatory arthritis that involves various combinations of complications of one
or more major peripheral joints or other joints, such as inflammation or deformity,
extra-articular features, repeated manifestations, and constitutional symptoms or
signs.

20 C.F.R. Part 404, Subpt. P, App. 1, § 14.00(D)(6)(e)(ii).

Brewer argues that she satisfied Listing 14.09(D) because she experienced repeated

manifestations of inflammatory arthritis with at least two constitutional signs of rheumatoid

arthritis, including persistent pain, swelling, tenderness, and a limited range of motion in various

parts of her body.  ECF Doc. 12, Page ID# 764.  Brewer argues that these symptoms limited her

activities of daily functioning and social functioning, and Brewer had to rely on her immediate family members to assist her with getting out of bed, brushing her teeth, grocery shopping, etc. Id. at 764-65.

However, the Commissioner correctly notes that Brewer does not explain how she meets the requirements of manifesting two constitutional symptoms or signs, because she fails to present evidence establishing that she suffers from severe fatigue, fever, malaise, or involuntary weight loss. *C.f. Connors v. Colvin*, 656 F. App'x 808, 810 (9th Cir. 2016) ("While there is some evidence of depression, neither the medical evidence cited by Connors, nor her own testimony, mentions severe fatigue, fever, or involuntary weight loss."); *see also Cox v. Comm'r of Soc. Sec.*, No. 5:14 CV 2233, 2015 WL 6545657, at *10 (N.D. Ohio Oct. 27, 2015) (finding plaintiff's limitation of her daily activities due to pain, chronic fatigue, and statements from her husband and friend regarding these conditions insufficient to demonstrate "repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)"). In fact, the records indicate that Brewer repeatedly reported to physicians that she had not experienced involuntary weight loss (Tr. 574, 576, 577, 580, 582, 585, 604, 634), malaise (Tr. 604, 634), or fever. (Tr. 570, 574, 576, 577, 578, 583, 584, 600, 634, 653, 655, 658)

Further, the symptoms of rheumatoid arthritis Brewer cites, standing alone, say nothing about the severity of any resulting functional limitations. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (affirming an ALJ's finding of no severe impairment where the doctors reports were silent regarding the intensity, frequency, and duration of arthritic pain and did not address the severity of the condition); *see also Klamm v. Berryhill*, No. 16CV02138, 2017 WL 2562641, at *14 (N.D. Ohio May 10, 2017), report and recommendation adopted sub nom. *Klamm v.*

*Comm'r of Soc. Sec.*, No. 16CV2138, 2017 WL 2559989 (N.D. Ohio June 13, 2017). Rather, as discussed above, the record indicates that Brewer's limitations were not as severe as Brewer alleges. Brewer cites to consultative examiner Dr. Sioson's assessment in which he found that the range of motion was normal in Brewer's left shoulder, elbow, wrist, fingers, hip, knee, and ankle and did not mention swelling or tenderness in any of Brewer's joints. (Tr. 344)

The ALJ also addressed Brewer's claimed limitations in activities of daily living in his analysis regarding Listing 12.04. (Tr. 21) The ALJ found that Brewer had only mild restriction in her activities of daily living, in part, because "[d]espite her alleged symptoms, the claimant reported an ability to perform multiple activities of daily living, including handling her personal care, performing light household chores, preparing meals, shopping in stores, driving, and managing her finances, appointments, and medications." (Id.) The ALJ also found Brewer had mild difficulties in social functioning. (Id.) The ALJ noted that Brewer continues to maintain friendships, maintains a Facebook account, uses the phone, talks to her mother daily, and many of her examiners noted Brewer was pleasant and cooperative during her examinations. (Id., citing Tr. 310, 314, 492). The ALJ also found that Brewer only had moderate difficulties with regard to concentration, persistence, or pace based on her ability to concentrate during examinations, complete activities of daily living, and respond appropriately to questions. (Tr. 21-22) The ALJ noted that by 2014, Brewer "denied experiencing a physical, mental, or emotional condition that affected her ability to concentrate, remember, or make decisions." (Id., citing Tr. 444-447).

In sum, the ALJ adequately evaluated the medical evidence regarding Brewer's rheumatoid arthritis and compared it to the requirements for Listing 14.09(A) and (D). There is no basis upon which to reverse or vacate the ALJ's determination regarding Listing 14.09. It

36

should be affirmed.

## VII.    Recommendation

Because the ALJ properly applied the treating source rule and correctly analyzed the

applicability of Listing 14.09, I recommend that the final decision of the Commissioner be

AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: December 19, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document. Failure to file
objections within the specified time may waive the right to appeal the District Court's order. See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).